IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| NICKLOS DRILLING COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 6:14-cv-21 |
| | § | |
| ACE AMERICAN INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF NICKLOS DRILLING COMPANY'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT
## REGARDING ACE AMERICAN'S BREACH OF ITS DUTY TO DEFEND

Nicklos Drilling Company, the plaintiff, moves for summary judgment on Ace's liability for breach of its duty to defend and on Nicklos's claim for declaratory judgment that Ace has a duty to defend Nicklos in the underlying case. Nicklos shows:

## I. FACTS

### A. The Nicklos-Miramar drilling contract and the Ace policy.

Nicklos is in the business of drilling oil and gas wells. Miramar Petroleum hired Nicklos to drill the Sartwelle #1 well on Miramar's lease in Jackson County, Texas (Exhs. 2, 5). The parties signed a Daywork Drilling Contract dated March 6, 2013 (Exh. 2; Exh. 15 ¶ 2). The contract provided that

Nicklos would drill the well on a "Daywork" basis, meaning that "[Nicklos] shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of [Miramar] (inclusive of any employee, agent, consultant or subcontractor engaged by [Miramar] to direct drilling operations)." (Exh. 2, p. 1).

The drilling contract contained a number of risk-shifting provisions in which the parties allocated between themselves the risk of certain losses (id. ¶¶ 14.1-14.13). The parties also agreed to insure the risks each assumed and to name the other as additional insured (id. ¶ 13). Exhibit "A" required each party carry Commercial General Liability Insurance with limits of $1,000,000 for bodily injury and property damage (Exh. 2 at NDC/ACE 000007 ¶ 3.2).

Ace American sold Miramar a commercial general liability policy covering the period May 16, 2012, to May 16, 2013 (Exh. 1). That policy included an "Additional Insured" endorsement expanding the definition of an insured to include "Any person or organization whom you have agreed to include as an additional insured under a written contract or agreement, provided such contract was executed prior to the date of loss." (Exh. 1 at ACE 00025).

### B.  The underlying lawsuit.

Drilling operations did not go as planned. On June 5, 2013, Miramar

2

sued Nicklos and American Petroleum Drilling Fluids (Exh. 3).  Miramar amended

its petition to add Cimarron Engineering, Inc., on August 6, 2013 (Exh. 4).

Because it had sued the wrong Cimarron entity, Miramar amended its petition

again on October 10, 2013, asserting the same claims against Cimarron

Engineering, LLC (Exh. 5).  In its Third Amended Petition filed on June 2, 2014,

Miramar expanded its allegations against Nicklos (Exh. 6).

As to Nicklos, Miramar's allegations in its Second Amended Petition

are identical to those in its First Amended Petition (*compare* Exh. 4 *with* Exh. 5.)

Miramar's First Amended Petition was its live pleading when Ace first denied

Nicklos's claim and Miramar's Second Amended Petition was its live pleading

when Ace last denied Nicklos's claim (Exhs. 7, 8, 9, 10).  Since most of the events

relevant to this matter occurred while Miramar's Second Amended Petition was its

live pleading, Nicklos will refer here to the allegations in Miramar's Second

Amended Petition.  Miramar makes the same allegations in its First Amended

Petition and in its Third Amended Petition.

Miramar alleges that the well blew out on April 15, 2013 (Exh. 5 ¶¶

14-16).  Miramar alleges that Nicklos and Cimarron "should have recognized that

the well was on the verge of blowing out and that the mud weight was

insufficient." (id. ¶ 15).  With regard to Cimarron Engineering, Miramar alleges,

"Miramar hired Defendant Cimarron to supervise and direct operations at the wellsite. . . . Cimarron's 'company man' lives on the wellsite and issues daily reports to the home office where their work is supervised." (id. ¶ 11); "Cimarron had a company man on site who should have been monitoring the mud, the pressures in the well, and the drilling." (id. ¶ 17). Concerning Nicklos, Miramar also alleges that "Nicklos had experienced well operators on site who should have recognized that the pressure in the well exceeded the weight of the mud and reported this to [American Drilling Fluids] and Cimarron." (id.).

Miramar alleges that the blow out damaged the well to the extent that Miramar is unable to access petroleum reserves, and that equipment, drill pipe, and tools were broken in the hole, which requires another well be drilled to access those reserves (id. ¶ 16).   Miramar seeks to recover "[a]ctual damages," "[d]amages for lost production," and "[e]conomic damages" (id., p. 6).

### C.  Ace American twice refuses Nicklos's demand for a defense.

On August 9, 2013, Nicklos sought defense and indemnity under the Ace American policy (Exh. 7).  Nicklos supplied Ace with a copy of the drilling contract, Miramar's original petition, and Miramar's first amended petition (id.). Ace denied Nicklos's claim on September 3, 2013 (Exh. 8).  Ace relied on the terms of the Additional Insured Endorsement (id. at 3).

4

Nicklos responded by letter dated October 8, 2013, disagreeing with Ace's conclusion concerning the Additional Insured Endorsement (Exh. 9). Nicklos again demanded defense and indemnity (id.).

On November 13, 2013, Ace sent an email saying it was continuing to investigate the matter (Exh. 10). On December 18, 2013, Nicklos demanded a response, again demanded defense and indemnity, and said it would refrain from filing suit for fifteen days so that Ace could respond to Nicklos's claim (Exh. 11). On January 2, 2014, Nicklos emailed Ace's counsel certain documents, including Miramar's second amended petition and the drilling contract (Exh. 12).

Nicklos filed this suit on February 10, 2014. By letter dated March 21, 2014, Ace again denied Nicklos's claim to a defense (Exh. 13). This time, Ace made no mention of the additional insured endorsement (id.). Instead, Ace relied on various policy exclusions (id.).

### D.  Recent developments in the underlying case.

On June 13, 2014 – two weeks after Miramar filed its Third Amended Petition – the trial court granted Nicklos partial summary judgment, ruling that Miramar take nothing on its claims against Nicklos Drilling Company (Exh. 14). That ruling is interlocutory as other claims and other parties remain pending.

## II. <u>ARGUMENT</u>

### *A.  Nicklos is an additional insured under the Ace policy.*

Texas law applies.  *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 205 (5th Cir. 1996).  Under Texas law, an insurer may have two duties regarding coverage – a duty to defend and a duty to indemnify.  *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 594 (5th Cir. 2011).  The two duties are distinct and decided separately.  *Id.*  Because Nicklos contends here that it is an additional insured under the policy Ace issued to Miramar, this court first decides whether Nicklos qualifies as an additional insured and, if so, whether, under Texas's eight-corners rule, the facts alleged in the underlying lawsuit trigger Ace's duty to defend Nicklos.  *Id.*

The Ace policy includes an additional insured endorsement that extends coverage to (1) any person or organization, (2) Miramar has agreed to include as an additional insured, (3) in a written contract or agreement, (4) if the contract is executed before the loss.  All of those requirement are met here.  Miramar agreed in a written contract to name Nicklos as an additional insured (Exh. 2 ¶ 13), the last party signed it on March 6, 2013 (id. ¶ 28), and the loss occurred on April 15, 2013, after the contract was signed (Exh. 5 ¶¶ 14, 16).

The additional insured endorsement adds insureds to the Ace policy:

6

> but only with respect to liability for . . . 'property damage' . . . caused
> in whole or in part, by [Miramar's] acts or omissions or the acts or
> omissions of those acting on [Miramar's] behalf:
> A. In the performance of [Miramar's] ongoing operations[.]

(Exh. 1 at ACE 00025).

Here, Miramar alleges that it hired Cimarron to provide a "company man" "to supervise and direct operations at the wellsite" (Exh. 5 ¶ 11). "The company man is responsible for operational issues on the location, including the safety and efficiency of the project. Even administrative managers are expected to respond to the direction of the company man when they are on the rigsite." *Expro Americas, LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 918 n.1 (Tex. App.–Houston [14th Dist.] 2011, no pet.).

Miramar alleges that "Cimarron should have recognized that the well was on the verge of blowing out and that the mud weight was insufficient" (Exh. 5 ¶ 15). Miramar further alleges that Cimarron's company man on the site "should have been monitoring the mud, the pressures in the well, and the drilling" (id. ¶ 17). Thus Miramar alleges that the acts and omissions of Cimarron, while acting on behalf of Miramar in the performance of Miramar's ongoing operations, caused the property damage in whole or in part. That meets the requirements of the Additional Insured Endorsement.

Moreover, the drilling contract expressly provided that Nicklos performed "under the direction, supervision and control of [Miramar] (inclusive of any employee, agent, consultant or subcontractor engaged by [Miramar] to direct drilling operations)" (Exh. 2, p. 1).  Miramar's petition alleges that Cimarron's company man was that agent, consultant, or subcontractor.

Where the drilling contract places responsibility for direction, supervision, and control on Miramar and Miramar delegates performance of that duty to Cimarron, Miramar remains liable for the actions of Cimarron.  *See Bolin Oil Co. v. Staples*, 496 S.W.2d 167, 175-76 (Tex. Civ. App.–Fort Worth 1973, writ ref'd n.r.e.) ("The plaintiff, driller, can not escape or avoid the legal duty or obligation imposed upon it by the contract to drill and complete the oil well in a good and workmanlike manner merely by assigning out or delegating a part of their performance of the contract to Leach Construction Company"); *Callon Petroleum Co. v. Big Chief Drilling Co.*, 548 F.2d 1174, 1178-79 (5th Cir. 1977) ("Callon chose to perform its obligation under the [drilling] contract to prepare a site by employing an independent contractor – Stanley.  However, Callon may not escape its obligation under the contract by delegation to a third party.").   So Cimarron's acts and omissions are imputed to Miramar.  That means that Miramar's allegations against Cimarron fall within the scope of the additional

8

insured endorsement as acts and omissions of Miramar that caused the property damage in whole or in part.  And, since the drilling contract specifies that Nicklos acted "under the direction, supervision, and control" of Miramar's agent or consultant, any claim that Nicklos was negligent also alleges that Miramar was negligent in directing, supervising, and controlling Nicklos's labor, equipment, and services.

Thus Nicklos meets the requirements of the additional insured endorsement and is an insured under the Ace policy.

**B.  The Ace policy covers Miramar's claims against Nicklos, so Ace has a duty to defend Nicklos against those claims.**

Under the eight-corners rule, this court determines Ace's duty to defend by looking only to the insurance policy and the pleadings in the underlying case.  *Ace American Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 840 (5th Cir. 2012).  This court applies the "eight corners" rule liberally in favor of the insured, Nicklos, and resolves any doubts in favor of Nicklos.  *E.g.*, *Primrose Operating Co. v. National American Ins. Co.*, 382 F.3 546, 552 (5th Cir. 2004). "If *any* allegation in the complaint is *even potentially* covered by the policy, then the insurer has a duty to defend its insured."  *Id.* (*quoting Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1492 (5th Cir. 1992))

9

(emphasis in original).

This court determines the duty to defend without regard to the truth or falsity of the facts pleaded in the underlying case; Ace is obligated to defend Nicklos if the facts alleged, taken as true, potentially assert a claim for coverage under the policy. *Ace American Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 840 (5th Cir. 2012). If Ace has a duty to defend Nicklos against any portion of the underlying suit, then Ace is required to defend the entire suit. *Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 201 (Tex. 2004).

In its policy, Ace promised:

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any suit seeking those damages. . . .

b.  This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; [and]

(2) The "bodily injury" or "property damage" occurs during the policy period[.] . . .

(Exh. 1 at ACE 00006, Sec. I ¶ 1). This case involves only claims for "property damage." The policy defines "property damage" as:

a.  Physical injury to tangible property, including all resulting loss of

use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(id. at ACE 00020, Sec. V ¶ 17).  The policy defines "coverage territory" as:

a.  The United States of America . . .

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in [the United States] or in a settlement we agree to.

(id. at ACE 00018, Sec. V ¶ 4).

The policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (id. at ACE 00019, Sec. V ¶ 13).  And the policy says that "suit" means, "a civil proceeding in which damages because of 'bodily injury', 'property damage', or 'personal and advertising injury' to which this insurance applies are alleged. . . ." (id. at ACE 00020, Sec. V ¶ 18).

Here, Miramar seeks to recover for damage to tangible property – the Sartwelle #1 well, the equipment lost in the well, and oil-and-gas reserves. Miramar alleges an accident occurring in Jackson County, Texas, on April 15, 2013.  *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex.

2007) ("An accident is generally understood to be a fortuitous, unexpected, and unintended event."). Jackson County is in the United States and the suit pends there, so the underlying occurrence and suit fall within the definition of "coverage territory." The blowout alleged to have occurred on April 15, 2013, falls within the policy period May 16, 2012, to May 16, 2013. So Miramar's suit alleges claims that fall within the scope of Ace's insuring agreement.

### C.  The Underground Resources and Equipment Coverage Endorsement provides coverage and trumps Ace's policy exclusions.

##### 1.  The Underground Endorsement expands coverage under the Ace policy to include specifically the losses claimed by Miramar.

Nicklos has the initial burden of establishing coverage under the terms of the Ace policy. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008). Generally, a commercial general liability policy grants the insured broad coverage for property damage and bodily injury liability, which is then narrowed by exclusions and expanded by endorsements. *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 10 (Tex. 2007); *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 2009 WL 5341825, 2009 U.S. Dist. LEXIS 124156 *13 (W.D. Tex., Sept. 30, 2009), *aff'd* 614 F.3d 105 (5th Cir. 2010).

Here, in addition to the main policy, Miramar bought an Underground

Resources and Equipment Coverage Endorsement ("Underground Endorsement") as part of the Ace policy (Exh. 1 at ACE 00046-47).  Generally, endorsements to a policy add coverages that would otherwise be excluded under the policy.  *TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 658 (Tex. App.–San Antonio 2005, no pet.); *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 2009 WL 5341825, 2009 U.S. Dist. LEXIS 124156 *13 (W.D. Tex., Sept. 30, 2009), *aff'd* 614 F.3d 105 (5th Cir. 2010).  Consequently, endorsements generally supersede and control over conflicting printed terms within the main policy.  *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 115 (5th Cir. 2010); *TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 658 (Tex. App.–San Antonio 2005, no pet.).

The Underground Endorsement explicitly provides for that result by saying, "This Endorsement modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE FORM" (Exh. 1 at ACE 00046) (emphasis in original).  The court construes the provisions in the main policy and the endorsement together unless doing so would negate or render superfluous the additional coverage afforded in the endorsement.  *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 115 (5th Cir. 2010).

The Underground Endorsement "added" coverage with respect to "property damage" falling within the "underground resources hazard" and the

13

"underground equipment hazard" "arising out of the operations performed by you or on your behalf and described in this endorsement" (Exh. 1 at ACE 00046-47). The Underground Endorsement described "operations" to include: "Oil or Gas Wells - drilling or redrilling, installation or recovery of casing" (id.).

The Underground Endorsement defined the covered "underground resources hazard" to include:

"property damage" to any of the following:

a. Oil, gas, water or other mineral substances which have not been reduced to physical possession above the surface of the earth or above the surface of any body of water;

b. Any well, hole, formation, strata or area in or through which exploration for or production of any substance is carried on.

(id. at ACE 00047, Sec. III). The Underground Endorsement also defined the covered "underground equipment hazard" to include:

"property damage" to any casing, pipe, bit, tool, pump or other drilling or well servicing machinery or equipment located beneath the surface of the earth in any such well or hole or beneath the surface of any body of water.

(id.). Again, the policy defines "property damage" to mean "physical injury to tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured" (Exh. 1 at ACE 00020, Sec. V ¶ 17).

14

Thus, the Ace policy covers Miramar's claims concerning the lost hole because the "underground resources hazard" added by the Underground Endorsement covers "[a]ny well [or] hole" and Miramar alleges physical injury to, and resulting loss of use of, the well or hole.  The Ace policy covers Miramar's claims concerning the oil-and-gas reserves because the "underground resources hazard" covers "oil, gas . . . or mineral substances . . . not reduced to physical possession above the surface of the earth" and Miramar alleges a loss of use of those substances.  And the Ace policy covers Miramar's claims concerning equipment, drill pipe, and tools broken in the hole because the "underground equipment hazard" added by the Underground Endorsement covers "any casing, pipe, bit, tool, pump or other drilling . . . machinery or equipment located beneath the surface of the earth in any such well or hole" and Miramar alleges physical injury to, and resulting loss of use of, the equipment, drill pipe, and tools.

2.  *Ace misplaces its reliance on exclusions 2.j(1), 2.j(5), 2.j(6), and 2.m because each is part of the printed terms of the main policy and so each is superseded by the Underground Endorsement.*

In its last letter denying Nicklos's claim, Ace relies entirely on various policy exclusions (Exh. 13).  Once Nicklos proves coverage, then, to avoid liability, Ace must prove that the loss falls within an exclusion.  *Ulico Cas. Co. v.*

15

*Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2002); Tex. Ins. Code Ann. §

554.002.  When interpreting an insurance contract, the court must adopt the

insured's construction of an exclusion as long as that construction is not

unreasonable, even if the construction urged by the insurer appears to be more

reasonable or a more accurate reflection of the parties' intent.  *Evanston Ins. Co. v.*

*ATOFINA Petrochems., Inc.*, 256 S.W.3d 660, 668 (Tex. 2008).  The court

construes exclusionary clauses strictly against the insurer and in favor of the

insured.  *Id.*  The insurer must express any intent to exclude coverage in clear and

unambiguous language.  *Id.*

Paragraph 2 of the policy lists various exclusions from coverage.

(Exh. 1 at ACE 00007-11).  In its letter, Ace relies on policy exclusions 2.j(1),

2(j)5, 2.j(6), and 2.m, contending that each bars all (2.j(6)) or part (2.j(1), 2(j)5,

and 2.m) of Miramar's claims (Exh. 13 at 2-3).  Each of those exclusions is part of

the printed terms of the main policy (Exh. 1 at ACE 00009-10).

Because endorsements generally add coverage and generally

supersede and control over conflicting printed terms in the main policy, the

Underground Endorsement trumps those exclusions.  That was the court's

conclusion in *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105,

115 (5th Cir. 2010).  There, the court faced the same argument involving two

identical exclusions, identical endorsement language, and another insurer seeking
to avoid coverage in a blowout case.  *Id.* at 115-16.  Like Ace, Mid-Continent
claimed exclusions 2.j(5) and 2.j(6) excluded coverage for the claims growing out
of the blowout.  *Id.*  The court rejected that argument.  For example, the court said:

> The application of exclusion 2.j.(5) would eliminate the additional
> coverage that Bay Rock purchased with the Oil & Gas Endorsement.
> Accordingly, we conclude that the district court did not err in finding
> that exclusion 2.j.(5) was superseded.

*Id.* at 115.  The court held the endorsement providing coverage controlled over the
exclusions contained in the printed terms in the main policy.  *Id.*  The court held
that, under the insurer's interpretation, the exclusions would each conflict with the
endorsement and so the endorsement would control.  *Id.* at 115-16.

While the court did not specifically address exclusions 2.j(1) and 2.m,
the court's reasoning applies equally to those exclusions.  If Ace's interpretation is
correct, then each conflicts with the Underground Endorsement and the
Underground Endorsement controls.

### D.  Exclusion 2.j(6) does not apply.

Ace's letter cites policy exclusion 2.j(6), contending that it bars
Miramar's claims regarding the equipment lost in the hole and the cost to drill a
replacement well (Exh. 13 at 2). Exclusion 2.j(6) excludes from coverage

"property damage" to:

> That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Exh. 1 at ACE 00010).  "Your work" is defined as:

> (1) Work or operations performed by you or on your behalf; and
> (2) Materials, parts or equipment furnished in connection with such work or operations.

(Exh. 1 at ACE 00021).

But exclusion 2.j(6) offers Ace no escape even if the Underground Endorsement did not supersede it.  That exclusion applies only to the "[t]hat particular part" of the insured's work that must be restored, repaired, or replaced because of work incorrectly done on it, not to *all* property damage that may result. That means that the exclusion only precludes coverage for repairing or replacing Nicklos's defective work; it does not exclude coverage for damage to Nicklos's non-defective work, nor does it exclude coverage for damage to other property resulting from the defective work.  *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 115-16 (5th Cir. 2010); *Mid-Continent Cas. Co. v. Krolczyk*, 408 S.W.3d 896, 901-03 (Tex. App.–Houston [1st Dist.] 2013, pet. denied).

So, exclusion 2.j(6) would not avoid coverage for Miramar's claim to recover for the cost of the equipment, drill pipe, and tools lost in the hole because

none of that is alleged to be part of Nicklos's defective work (Exh. 5 ¶ 16).

Instead, that would be damage to other property resulting from the defective work.

Nor would the exclusion exclude coverage for Miramar's claim for the damage to

the 8,600 feet of non-defective hole Miramar alleges was drilled before the well

blew out (Exh. 5 ¶ 14).  *See Mid-Continent Cas. Co. v. Bay Rock Operating Co.*,

614 F.3d 105, 115-16 (5th Cir. 2010) (where evidence showed that the intermediate

casing seat and surrounding formation were the property that was the subject of

driller's defective work, exclusion 2.j(6) did not exclude coverage for resulting

damage to other property).  Since Ace would have a duty to defend those claims,

Ace is required to defend the whole suit.  *Utica Nat. Ins. Co. of Tex. v. Am. Indem.*

*Co.*, 141 S.W.3d 198, 201 (Tex. 2004).

### E.  Exclusion 2.j(1) does not apply.

Ace's letter also claims that exclusion 2.j(1) excludes coverage for

Miramar's claims related to the well and the obstructed petroleum reserves (Exh.

13 at 2-3).  Exclusion 2.j(1) excludes coverage for "property damage" to:

> [p]roperty you own, rent, or occupy, including any costs or expenses
> incurred by you, or any other person, organization or entity, for repair,
> replacement, enhancement, restoration or maintenance of such property
> for any reason, including prevention of injury to a person or damage to
> another's property[.]

(Exh. 1 at ACE 00009).

19

Exclusion 2.j(1) does not apply here.  Exclusion 2.j(1) applies to property that Nicklos holds for its own use, like Nicklos's office or the yard where Nicklos stores its equipment, not to drillsites where Nicklos is performing its operations.  If exclusion 2.j(1) applies to the drillsite because Nicklos's rig was located there during drilling operations, then exclusion 2.j(5) would be rendered meaningless because 2.j(5) applies to "[t]hat particular part of real property on which [Nicklos] . . . [was] performing operations."  If Exclusion 2.j(1) operates as Ace contends, then there would be no need for exclusion 2.j(5) at all.  *See Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465-67 (Tex. 1998) (if any presence, no matter how transitory constitutes occupancy under one exclusion, second exclusion would be meaningless).   This court gives effect to all of the policy's provisions so that none will be rendered meaningless.  *Id.* at 464.

Exclusion 2.j(1) applies to property that Nicklos owns, rents, or occupies.  It is undisputed that Nicklos did not own or rent the drillsite location.  That leaves only the word "occupy."  In the *Kelley-Coppedge* case, Kelley-Coppedge, an oil and gas pipeline contractor, was laying pipe along an easement when its crew inadvertently struck a Mobil pipeline causing an oil spill that damaged a third party's land on which the easement was located.  *Id.* at 463.  Kelley-Coppedge had a commercial general liability policy issued by Highlands.

*Id.* Highlands denied coverage, claiming that Kelley-Coppedge "occupied" the site at which it was performing its work and so the claim fell within an exclusion. *Id.* at 464.  The Texas Supreme Court rejected Highlands's argument.

The court held that the term "occupy" means "to hold or keep for use." *Id.* at 467.  The court concluded that Kelley-Coppedge's transitory presence on another's property for the purpose of performing its operations did not cause it to "occupy" the property within the meaning of the exclusion.  *Id.  See also Gregory v. Tennessee Gas Pipeline Co.*, 948 F.2d 203, 207 (5th Cir. 1991) (holding to occupy something is to hold or keep for use); *United States Fidelity & Guaranty Co. v. B & B Oil Well Service, Inc.*, 910 F.Supp. 1172, 1178 (S.D. Miss. 1995) (oil well servicing contractor did not "occupy" well site within meaning of exclusion).

Here, Nicklos did not hold or keep the drillsite for its own use.  To the contrary, the lease was Miramar's (Exh. 5 ¶ 8).  Nicklos's transitory presence on Miramar's lease to perform its drilling operations does not qualify as occupying the drillsite.  Exclusion 2.j(1) does not apply here.

**F.  Exclusions 2.j(5) and 2.m, standing alone, would not allow Ace to escape its duty to defend even if the Underground Endorsement did not supersede them.**

In its letter, Ace does not contend that either exclusion 2.j(5) or 2.m

excludes coverage for Miramar's claims concerning the equipment lost on the hole

(Exh. 13 at 2-3).  So even if exclusions 2.j(5) and 2.m did apply – which we deny

– Ace would still have a duty to defend Nicklos against Miramar's claims

concerning the equipment lost in the hole.   Because Ace has a duty to defend

Nicklos against one portion of the underlying suit, Ace is required to defend the

entire suit.  *Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 201

(Tex. 2004).

### G.  The Professional Services Exclusion does not relieve Ace of its duty to defend.

#### 1.  *The Professional Services Exclusion does not apply here.*

Lastly, Ace's letter relies on the Professional Services Exclusion

(Exh. 13 at 2).  The Professional Services Exclusion says:

> With respect to any professional services shown in the Schedule, the
> following exclusion is added to Paragraph 2., Exclusions of Section I -
> Coverage - Bodily Injury And Property Damage Liability . . . :
> This insurance does not apply to . . . "property damage" . . . due to the
> rendering of or failure to render any professional service.

(Exh. 1 at ACE 00026).  The Schedule lists the following:

> 1.  The preparing, approving, or failure to prepare or approve maps,
> shop drawings, opinions, reports, surveys, field orders, change orders,
> or drawing and specifications and supervisory, inspection, architectural
> or engineering activities

2. Any other professional services provided by the insure [sic]

(id.).

This court strictly construes the Professional Services Exclusion.
*Mid-Continent Cas. Co. v. Krolczyk*, 408 S.W.3d 896, 901 (Tex. App.–Houston
[1st Dist.] 2013, pet. denied).  This court will adopt the construction urged by
Nicklos as long as that construction is not unreasonable, even if the construction
urged by Ace American appears to be more reasonable or a more accurate
reflection of the parties' intent.  *Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141
S.W.3d 198, 202 (Tex. 2004).

Miramar does not allege that Nicklos did anything falling within
subpart 1 of the Professional Services Exclusion, so Nicklos presumes Ace relies
on the reference to "other professional services."  Ace's policy does not define the
term "professional services" (Exh. 1).

The court faced a similar exclusion in *Maryland Casualty Co. v.
Crazy Water Co.*, 160 S.W.2d 102 (Tex. Civ. App.–Eastland 1942, no writ).
There, the issue was whether a "tubber" – that is, a person who assisted the hotel's
guests with their baths – fell within the liability policy's exclusion that applied to
"the rendering of any professional services or the omission thereof."  *Id.* at 103-04.
The court held it did not.  The court said:

23

In some sense, of course, a profession involves labor, skill, education, special knowledge and compensation or profit.  The labor, as well as the skill, however, involved is predominantly mental or intellectual, rather than physical or manual.

*Id.* at 104-05.

The Waco Court of Appeals agreed in *Retherford v. Castro*, 378 S.W.3d 29 (Tex. App.–Waco 2012, pet. denied), a case involving the Texas Deceptive Trade Practices Act's professional services exemption.  The court said:

We agree with the Eastland Court of Appeals' definition that a professional: (1) engages in work involving mental or intellectual rather than physical labor; (2) requires special education to be used on behalf of others; and (3) earns profits dependent mainly on those considerations.

378 S.W.3d at 36.  *See also Aetna Fire Underwriters Ins. Co. v. Southwestern Engineering Co.*, 626 S.W.2d 99, 101 (Tex. App.–Beaumont 1981, writ ref'd n.r.e.) ("We cannot say as a matter of law the physical act of digging for and locating underground pipelines requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, or engineering sciences, so as to constitute the practice of professional engineering."); *Utica Nat. Ins. Co. of Tex. v. Texas Prop. & Cas. Ins. Guaranty Ass'n*, 110 S.W.3d 450, 456-57 (Tex. App.–Austin 2001), *aff'd in part, rev'd in part on other grounds*, 141 S.W.3d 198 (Tex. 2004) (failure to properly store

drugs and screen people with access to them were acts independent of professional training, education, and expertise).

Other courts have reached the same conclusion when applying professional services insurance exclusions.  For example, in *Harad v. Aetna Cas. and Sur. Co.*, 839 F.2d 979 (3rd Cir. 1988), the court described "professional services" to mean:

> Something more than an act flowing from mere employment or vocation . . . [t]he act or service must be such as exacts the use or application of special learning or attainments of some kind.  The term "professional" . . . means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities.  A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.

*Id.* at 984, *quoting*, *Marx v. Hartford Accident and Indemnity Co.*, 157 N.W.2d 870, 871-72 (Neb. 1968).  The Third Circuit cited five other federal cases, including cases from the Eighth, Ninth, and Tenth Circuits.  *Id.*

Indeed, the specific activities listed in the exclusion are consistent with the notion that the Professional Services Exclusion applies to services where the work involves mental or intellectual services, rather than physical labor.  The specific activities are: (1) preparing, approving, or failure to approve maps, shop

drawings, opinion, reports, surveys, field orders, change orders, or drawing and specifications, and (2) supervisory, inspection, architectural, or engineering activities.  None involves physical labor.  But, whatever else may be said about drilling oil and gas wells, it is not "work involving mental or intellectual rather than physical labor" (Exh. 15 ¶ 3).  So it is not "professional services" falling within the exclusion.

2.  *The Professional Services Exclusion is either itself ambiguous or it creates an ambiguity by conflicting with the Underground Endorsement, either of which results in coverage.*

As noted, Ace's policy does not define the term "professional services."  In *Pacific Indem. Co. v. Linn*, 766 F.2d 754 (3d Cir. 1985), the court held that a professional services exclusion that did not define the term "professional services" was ambiguous because it was reasonably susceptible to more than one interpretation.  *Id.*  Ambiguities in insurance policies are construed against the insurer under Texas law.  *Lain v. UNUM Life Ins. Co. of America*, 279 F.3d 337, 345 (5th Cir. 2002).  The insurer must express any intent to exclude coverage in clear and unambiguous language.  *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660, 668 (Tex. 2008).

Moreover, applying the Professional Services Exclusion to drilling oil

and gas wells would negate the specific coverage provided by the Underground
Endorsement.  The Underground Endorsement applies to the insured's
"operations" and specifically lists "Oil or Gas Wells - drilling or redrilling" among
the "Description of Operations" (Exh. 1 at ACE 00046).  The specific
Underground Endorsement controls over the general Professional Services
Exclusion.  *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-34 (Tex. 1994)
(specific provisions control over general ones).  Because this court construes the
underlying lawsuit to trigger coverage, in the event of a conflict between the
Professional Services Exclusion and the Underground Endorsement that renders
the Endorsement meaningless, the Underground Endorsement controls.  *Century
Sur. Co. v. DeLoach*, No. 13-12-00072-CV, 2013 WL 4106702, 2013 Tex. App.
LEXIS 9484 at *12-*19 (Tex. App.–Corpus Christi, Aug. 1, 2013, no pet.).

Ace's interpretation of the Professional Services Exclusion conflicts
with the Underground Endorsement in another respect.  The Underground
Endorsement provides coverage for "property damage" "*arising out of* the
operations conducted by" the insured (Exh. 1 at ACE 00046) (emphasis supplied).
The Professional Services exclusion excludes coverage for "property damage"
"*due to* the rendering of or failure to render any professional service." (id. at ACE
00026) (emphasis supplied).  The phrase "arising out of" appears throughout the

27

policy, including in the context of other exclusions (*see*, *e.g.*, Sec. I.2.f. at ACE 00008 (excluding coverage for bodily injury and property damage "arising out of" discharge or release of pollutants)).  The fact that the Professional Services Exclusion uses the phrase "due to" shows the parties intended it to have a different meaning than the phrase "arising out of."

"Arising out of" is broader than the "due to" requirement of the Professional Services Exclusion.  *Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 202-03 (Tex. 2004).  For the loss to be one "arising out of" operations conducted by the insured, there need only be a causal connection or relation.  *Id.* at 203.  Simple "but for" causation, rather than direct or proximate causation, is all that is required.  *Id.*  On the other hand, the "due to" language requires a more direct type of causation that ties the insured's liability to the manner in which the services were performed.  *Id.*

Thus the Professional Services Exclusion would only preclude coverage if Miramar's injury was caused directly by the breach of a professional standard of care.  *Id.* at 202.  Meanwhile, the Underground Endorsement provides coverage if there is a causal connection or relation between Miramar's injury and Nicklos's operations.  Miramar does not allege a breach of any professional standard of care applicable to Nicklos (Exh. 5).  Nor is Nicklos aware of any

28

professional standard of care that would apply to Nicklos.

   3. *Even if the Professional Services Exclusion applied as Ace contended, it would not relieve Ace of its duty to defend.*

   Ace's reliance on the Professional Services Exclusion fails for yet another reason.  Ace points only to Miramar's allegation that "Nicklos had experienced well operators on site who should have recognized that the pressure in the well exceeded the weight of the mud and reported this to [American Drilling Fluids] and Cimarron." (Exh. 13 at 2; Exh. 5 ¶ 17).  But Miramar also alleges that "Nicklos . . . should have recognized that the well was on the verge of blowing out and that the mud weight was insufficient." (Exh. 5 ¶ 15).  That allegation alone is sufficient to trigger Ace's duty to defend because Ace is required to defend the entire suit if Ace has a duty to defend any portion of the underlying suit.  *Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 201 (Tex. 2004).

## III.  <u>CONCLUSION</u>

   The court should grant Nicklos summary judgment declaring that Ace has a duty to defend Nicklos against Miramar's claims in the underlying case and that Ace has breached its insurance contract by failing and refusing to do so. Following that determination, the court should proceed to determine Nicklos's

damages flowing from that breach and Nicklos's reasonable and necessary attorneys' fees incurred to pursue this breach of contract case against Ace American.

Respectfully submitted,

 /s/ Roy L. Barnes
ROY L. BARNES, Attorney-in-Charge
State Bar No. 01772500
Southern District Bar No. 14055
RBarnes@TBGDLaw.com

Of Counsel:
JESUS GARCIA, JR.
State Bar No. 24027389
Southern District Bar No. 30623
Jgarcia@TBGDLaw.com

TUCKER, BARNES, GARCIA &
DE LA GARZA, P.C.
712 Main St., Suite 1600
Houston, Texas 77002
(713) 228-7425
(713) 228-7329 (Fax)

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was served on the following via the Court's Electronic Filing System:

Alicia G. Curran, Esq.
1717 Main Street, Suite 3400
Dallas, Texas 75201

on this __1st__ day of August, 2014.

/s/ Roy L. Barnes
ROY L. BARNES